**David Michael JONES, Plaintiff,**

v.

**Mark THOMPSON, et al., Defendants.**

**No. IP 90–1583–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

·March 31, 1993.

Richard L. Darst, Mantel Cohen Garelick Reiswerg & Fishmann, Indianapolis, IN, Attorney for plaintiff.

William J. Norton, Anderson, IN, Attorney for defendants.

### ENTRY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH JUDGMENT TO FOLLOW

TINDER, District Judge.

This cause came before the court for trial on February 3, 4, and 5, 1992 on the Complaint of Plaintiff David Michael Jones and on the Defendants' Answer. The Plaintiff was present in person and by counsel, as were the Defendants. The cause was submitted and the evidence heard. At the conclusion of the Plaintiff's case, the court dismissed the claims against Defendants Hanna and Tibbets in both their individual and official capacities. This left the claims against Defendants Thompson, Maxey, Humerickhouse and Allen in both their individual and official capacities.

Whereupon the court, having considered such pleadings and the evidence adduced thereon, and having further considered the arguments of the parties with respect to this action, and being duly advised, now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff David Michael Jones ("Jones") is an inmate of the Indiana Department of Correction who was formerly and periodically confined in the Madison County Jail ("the Jail").

2. Insofar as pertinent to the present action, Jones was arrested in December 1988 for battery and for sale of a counterfeit drug. The Jail's logs show his arrest on December 19, 1988 and a medical entry for December 20, 1988 providing Jones with medication to lessen the effects of his withdrawal from drugs. It also noted his date of birth to be July 13, 1958, his height to be 5' 11" and his weight to be 160 pounds.

3. Jones was assigned to the second floor in "B" Block. After a point, he became despondent. His girlfriend was four months pregnant. He saw his girlfriend when he was looking out the window of the jail. His ex-wife had his girlfriend in the car and talked her into becoming an exotic "topless" dancer despite her pregnant condition. This was very upsetting to Jones so he took a bed sheet and tied it around his neck and tried to hang himself. This occurred during the afternoon of January 25, 1989.

4. Jail guards found him, took him down, chained him and placed him on a cart. He was then taken via that cart, face down, to a "detox" unit, located on the first floor of the

Jail. The window of the detox unit was large and faced the Jail's main control area. Jones had only been in the jail approximately two weeks at that point. He had had no incident reports on him as of that point.

5. The detox unit into which Jones was placed was a barren room. It had a steel bench, about 18 inches wide and of undetermined length, but Jones could not mount it without assistance because of the restraints kept on him.

6. While in the detox unit, Jones remained with few exceptions in a three-way restraint, consisting of a belly chain wrapped around his stomach area, handcuffs on his waist and leg shackles on his legs and then a chain was run between the leg chains and the ankle chains through the belly chain. His feet were about six inches apart. All that Jones could do in terms of movement was roll or creep. He could not stand or sit, but could only squat. At any one time he could not raise higher than about a little above his waist level. The most descriptive appellation for this method of restraint is that the plaintiff was "hog-tied."

7. When he was first placed in the detox unit he was laid on the cement floor and left. There was no mattress in the cell. There was no blanket. He could not even get up to the steel bench in the Detox tank without help from guards. The Plaintiff was bare above the waist and was without shoes, sandals or socks.

8. Jones stayed in that chained condition for approximately one week. He was visited during that time by his mother, his girlfriend and his stepsister. They came in to help try to calm him down. When visitors came, they were allowed to go into the cell, but he was not released from his chains. In order to be fed he had to have help sitting up. Guards would unhook his left hand and hand him a tray. After eating, his hand would be handcuffed back to his waist.

9. He was unable to use the toilet facilities because of his chained condition so he would often just use the drain in the floor when he was lying on the floor. The drain was under the bench and there was a hole in the floor. He did this because he couldn't stand up to use the toilet for the reasons already described.

10. During this time Jones was also without articles for personal hygiene and was not allowed to shower or change clothes. During this time Jones was also distraught and combative.

11. Jones was removed from the detox unit for the first time after his placement to be taken to the office of Dr. Richardson, who interviewed and evaluated Jones on January 30, 1989 for the purpose of determining his competency to stand trial and to evaluate him for suicide potential. This session, during which Jones remained shackled to some extent, was conducted at the Center for Mental Health in Anderson, Indiana and resulted in Dr. Richardson's opinion that Jones was competent at the time of the alleged offenses, was competent to stand trial and was "a suicide risk and possible homicide risk." The report containing this opinion was apparently issued on February 10, 1989. Dr. Richardson intended for this information to be "passed to the jail," but there was no evidence that it was.

12. Jones' first shower after being placed in the detox unit was after his interview with Dr. Richardson. Family members were permitted to visit and other lay persons did visit (including Chris Wallace, another inmate) to help Jones calm down.

13. These efforts, over a period of days, were sufficiently successful that on February 1, 1989 Jones was taken from the detox unit and placed in a (regular) cell with Chris Wallace.

14. The next medical entry in the Jail's logs is for July 1989, when Jones requested an increase in his prescription for valium. The request was denied. There are no records showing when or why the valium prescription started. There are also no medical notes of treatment, consultation or the like in reference to Jones' attempted suicide or the following week he spent in the detox unit.

15. At the times pertinent to this suit the Madison County Sheriff's Department contracted with an outside group of physicians to provide medical care for Jail inmates. These physicians were not contacted regarding Jones' attempted suicide or the use of

restraints on him following the attempted suicide.

16. Jones suffered minor physical injuries during his ordeal in the form of bruises on his wrists, elbows and ankles. He also suffered emotional distress and anxiety because everyone passing by the Jail's control desk, in addition to those who came specifically to visit him, could see him in his restrained condition.

17. A second use of restraints on Jones occurred in late May 1989. These were used after a number of incidents in which he had been disruptive, abusive and threatening to the Jail staff. On this second occasion the third chain, running between the ankle chain and the waist chain, was not used and though placed in the detox unit Jones was not deprived of the basic necessities for his care and welfare.

18. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the court.

## CONCLUSIONS OF LAW

1. Plaintiff's action is brought pursuant to 42 U.S.C. § 1983, which provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Jurisdiction for this action is conferred by 28 U.S.C. § 1343(3).

2. To state a claim for relief under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 46, 108 S.Ct. 2250, 2253, 101 L.Ed.2d 40 (1988).

3. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), signals the care with which the lower courts must identify appropriate constitutional standards.

The starting point in an analysis of a Section 1983 claim "is the isolation of the specific federal right that plaintiff claims defendant violated when acting under color of state law." *Jackson v. Byrne,* 738 F.2d 1443, 1445–46 (7th Cir.1984).

4. It is clear that between arrest and trial a detainee is entitled to the protection of the Fourteenth Amendment. *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10. "Due process requires that a pretrial detainee not be punished." *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979).

5. While the government may not punish a pretrial detainee, it may impose on him conditions and restrictions necessary to maintain jail security. *Id.* at 540, 99 S.Ct. at 1874. Absent a showing that prison officials intended to punish, the determination of whether the restriction is punitive or incidental to a legitimate governmental purpose will turn on " 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' " *Id.* at 538, 99 S.Ct. at 1874 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963)).

6. Thus, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment." *Bell,* 441 U.S. at 539, 99 S.Ct. at 1874.

7. Under the above standards, it is clear that some restraint and extraordinary intervention was warranted when Jones was found trying to commit suicide. Obviously, he needed to be taken down so the suicide attempt would be unsuccessful. He needed to be sufficiently secured so that further efforts, if made, would not endanger him. "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell,* 441 U.S. at 540, 99 S.Ct. at 1874–75.

8. Here, the extended use of the three-way restraints on Jones following his suicide attempt, coupled with the absence of medical review or treatment and the denial of even basic amenities such as personal hygiene and toilet usage, was not reasonably related to a legitimate goal or interest of the Jail. It was, therefore, "punishment" in a constitutional sense and cannot be excused by the circumstances which initially justified some restraint. This was nothing short of flagrant governmental abuse which is decried by the Due Process Clause.

■ 9. Who, therefore, is responsible for this? Since Jones was retained in the detox unit at the direction of Captain Maxey and likewise kept in such severe restraints without medical evaluation at her direction, she is liable for the violation of his rights. The court likewise concludes that Defendant

Mark Thompson is liable because of the binding effect of the Plaintiff's unanswered requests for admissions. Defendant Humerickhouse, as shift commander, is also liable, though to a lesser extent. The nature of Jones' treatment was made known to Humerickhouse, and he condoned it through his lack of intervention to end this unconstitutional abuse. He made no effort to have a medical evaluation conducted regarding the continued need for "hog-tying" the plaintiff. Nonetheless, Captain Maxey made more direct and ultimate decisions to maintain the "hog-tied" plaintiff on display in the detox unit. The court does not find Defendant Harley Allen liable for the retention of the Plaintiff in restraints nor in the denial of appropriate care, which is at the heart of the constitutional violation here.

10. The court assesses the Plaintiff's compensatory damages as follows:

| | |
|---|---|
| From former Sheriff Mark Thompson | Two Thousand Dollars ($2,000.00) |
| From Captain Doris Maxey | Two Thousand Dollars ($2,000.00) |
| From Sgt. Randy Humerickhouse | One Thousand Dollars ($1,000.00) |

---

These awards are made against the designated Defendants in their individual capacities. The aggregate compensatory damages awarded are Five Thousand Dollars ($5,000.00).

■ 11. Punitive damages are available in a Section 1983 action when the defendant's conduct is shown to have been motivated by an evil motive or intent or a reckless or callous indifference to the federally protected rights of others. *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986). The sole Defendant as to whom this finding is warranted is Defendant Maxey, whose authority, presence and knowledge of the continuing retention of Jones day after day without a systematic or humane response to his condition demonstrates her complete callousness to that condition. Puni-

tive damages are assessed against Defendant Maxey in the amount of Two Thousand Dollars ($2,000.00). This award should deter persons responsible for the management of the Madison County Jail and the treatment of prisoners from either failing to respond or responding in a manner below the level required by the Constitution. The humane treatment of detainees such as Jones is the County's obligation and it must entrust that responsibility to those capable of and willing to carry it out. This starts with the command and procedures in the Jail, which the evidence in this case shows to be shockingly deficient. Perhaps most compelling in this regard is the fact that, at least as of the trial, this "hog-tying" procedure without medical evaluation was still in use in the Madison County Jail under the auspices of Captain Maxey.

12. The Plaintiff also sought in his Complaint to have the Defendants fired from their positions. The authority to remove elected or appointed county officials is not conferred by 42 U.S.C. § 1983, nor would

such action be appropriate even if the authority existed.

13. Consistent with conclusion of law number 10, the court finds for Defendant Harley Allen and against Jones on the Complaint.

■ 14. Jones' claims are also asserted against the Defendants in their official capacities. To this extent the action is in all respects other than name against Madison County itself. This is because the Supreme Court has repeatedly held that "the real party in interest in an official capacity suit is the entity represented and not the individual officeholder." *Karcher v. May*, 484 U.S. 72, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987) (citing cases).

■ 15. Madison County is a "person" subject to suit within the meaning of 42 U.S.C. § 1983. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). The parameters of municipal liability under Section 1983 were reviewed by the Court in *Woods v. City of Michigan City, Ind.*, 940 F.2d 275, 277–78 (7th Cir.1991):

A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. [*Monell*, 436 U.S.] at 694–95 [98 S.Ct. at 2038]. "It is only when the 'execution of [the] government's policy or custom … inflicts the injury' that the municipality may be held liable under § 1983." *Springfield, Mass. v. Kibbe*, 480 U.S. 257, 267, 94 L.Ed.2d 293, 107 S.Ct. 1114 [1119] (1987) (quoting *Monell, supra*, 436 U.S. at 694 [98 S.Ct. at 2037] ). "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691 [98 S.Ct. at 2036] (emphasis added). The "official policy" requirement was intended to distinguish acts of the municipality from acts of employees

of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible … Recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–480, 89 L.Ed.2d 452, 106 S.Ct. 1292 (1986).

Thus, the official acts of a municipality include those of governmental officials "whose acts or edicts may fairly be said to represent official policy." *Monell, supra*, [436 U.S.] at 694 [98 S.Ct. at 2037–38]. When the execution of such a policy or custom results in the deprivation of citizens' rights and privileges, the municipality may be subject to liability under § 1983. Municipal liability under § 1983 "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur, supra*, 475 U.S. at 481, 106 S.Ct. at 1299.

*See also Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir.1992); *Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir.1990).

■ 16. The evidence here supports the conclusions that the Defendants' actions and inaction were the result of both policymakers of Madison County—Sheriff Thompson and Captain Maxey—and of the custom and practice to apply restraints without medical consultation and keep them on for extended and undocumented periods without review. The practice may be infrequently invoked, but is nonetheless barbaric. As Defendant Humerickhouse testified, Jail deputies had been trained on how to apply restraints but not on when to take them off or how to ensure a detainee's welfare during the time the restraints were in use.

The decisions were entirely *ad hoc* rather than procedurally structured, guided and professional.\* While the evidence does not

---

\* It should be noted that the Madison County Sheriff's Department comes into this proceeding with substantial awareness of its constitutional obligation to detain inmates in a humane manner. As part of its defense, the County made much of the fact that it had spent large sums of money in building a new jail facility in recent years and in staffing that facility. Of course, no small part of those expenditures were motivated by the Consent Decree entered against the County in a class

action civil rights suit in this court. *See Madison County Jail Inmates, et al. v. Mark Thompson, et al.*, 773 F.2d 834 (7th Cir.1985). The landscape of this case includes that extant Consent Decree. Defendant former Sheriff Thompson demonstrated a remarkable lack of knowledge or concern about the terms of that decree during his testimony at trial. As oblivious as Sheriff Thompson appeared to be about the decree, his jail manage-

support the view that Madison County intended harm to Jones or others who may have been placed in his predicament, it does lead invariably to the conclusion that it was the custom to be completely indifferent to detainees in severe restraints. This custom, being the lack of procedures and training in the management and care of such detainees, was also the cause of the punishment of Jones. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989) ("our first inquiry in any case alleging municipal liability under § 1983 is the question of whether there is a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation"). Madison County (being the Plaintiff's action against the Defendants in their official capacities) is liable to the Plaintiff for his compensatory damages in the amount of Five Thousand Dollars ($5,000.00).

■ 17. No punitive damages can be awarded against the Defendants in their official capacities. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981).

■ 18. The situation with respect to the alleged mistreatment of the Plaintiff during May and June of 1989 stands in marked contrast to his treatment the last week of January of 1989. The restrictions and treatment of Jones during this second period were not without legitimate rationale and were not "punishment" in violation of his Fourteenth Amendment rights. As to this second period, therefore, the court finds against Jones on his Complaint.

■ 19. The parties also argued over the wisdom and utility of the court in this case imposing guidelines for the Madison County Sheriff to follow. That task, however, is beyond the relief which is available in this case (although the standard of *Wolfish* that a detainee may not be "punished" should come as no surprise). Jones was not in the Jail when this case was filed and has not been there since, much less subjected to or threatened with the use of severe restraints. Injunctive relief, such as laying out training

or other guidelines for the treatment of detainees, is precluded unless a plaintiff can demonstrate an ongoing injury or a threat of future injury; absent such a showing, a plaintiff cannot satisfy the "case or controversy" requirement of Article III. *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969).

20. During a pretrial conference, counsel for the Plaintiff confirmed that if the Plaintiff prevailed in the litigation, he would seek an award of attorney fees and other costs under 42 U.S.C. § 1988. Accordingly, Counsel for the Plaintiff will have thirty (30) days from this date to file a petition documenting such a request. If no such petition is filed, then a final judgment consistent with this entry will issue. If such a request is made, any party opposing the petition shall have a further period of thirty (30) days in which to respond and counsel for the Plaintiff will have fifteen (15) days to reply. If the issue of fees and costs must be resolved, a judgment will not be issued until the court has reviewed and ruled upon that matter. Of course, counsel are encouraged to attempt to reach an agreement, if possible, on this issue.

In either event, the Clerk is directed to refrain from entering judgment in this cause until specifically directed to do so by the court. The reason for the delay in the entry of judgment is to avoid the possibility of multiple appeals.

ALL OF WHICH IS ENTERED.

---

ment team appeared to be equally oblivious to the medical and constitutional dangers posed by the "hog-tie" method of "treating" a person who recently attempted suicide.